[Civ. No. 15222. First Dist., Div. One. Nov. 26, 1952.]

DONALD ROMACA, Appellant, v. ADOLPH L. MEYER, Respondent.

Mack & Jorgenson and Samuels & Thoits for Appellant.

Long & Levit and David C. Bogert for Respondent.

BRAY, J.—Plaintiff appeals from a judgment in favor of defendant, in an action for overtime pay, liquidated damages and attorney's fees, brought under the federal Fair Labor Standards Act of 1938. (52 Stats. 1060, 29 U.S.C.A. §§ 201-219.)

### QUESTIONS PRESENTED

Primarily: (1) Was plaintiff engaged in working on, or in any process necessary to the production of, goods for interstate commerce? (2) If so, can his employer be held under the act without proof that the latter knew that the goods were for interstate commerce?

### FACTS

Defendant manufactures tools, dies and parts, at Mountain View. For a period he employed plaintiff as a tool and die maker. The tools, dies and parts he worked on were sold by defendant to several concerns. Of those concerns the two in question here are Dalmo-Victor, located in Redwood City,

and Marchant Calculating Company located in Emeryville. Plaintiff worked on cover dies, i.e., dies which would make metal cases for calculating machines. These cover dies were sold and delivered by defendant to Marchant at Emeryville. Each die would make thousands of these cases. Plaintiff also worked on certain parts to go on radar units, which parts were sold and delivered to Dalmo-Victor at Redwood City. There they were assembled into radar units which were then shipped east to Westinghouse, pursuant to a contract between Dalmo-Victor and Westinghouse. After leaving defendant, plaintiff was employed by Dalmo-Victor and reworked slightly and placed on the radar units the parts which defendant had delivered. Defendant testified that he did not learn of the contract between Dalmo-Victor and Westinghouse until after he had produced the parts which Dalmo-Victor received. There is no evidence as to whether or not any Marchant calculators upon which defendant's cover dies were used were shipped out of the state. The evidence shows that during his employment plaintiff worked considerable overtime, for no part of which was he paid time and a half.

The court found that none of the *tools or dies* upon which plaintiff worked were sold to or used by purchasers engaged in the production of any products produced or used in interstate commerce or outside the state; that none of the processes or services performed by plaintiff affected or were necessary to the production of any products leaving California nor were any of said *tools or dies* used in interstate commerce or affected it.

### The Law Applicable

29 U.S.C.A., section 207, provides that no employer shall employ any of his employees "who is engaged in commerce or in the production of goods for commerce" for a work week longer than 40 hours unless the employee receives time and a half for the overtime. At the time this action was filed section 203 defined "goods" as "goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof. (j) 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chap-

ter an employee *shall be deemed to have been engaged in the production of goods if* such employee was employed in *producing,* manufacturing, mining, handling, transporting, or in any other manner *working on* such goods, *or in any process* or occupation *necessary to the production thereof,* in any State."*

Section 203 (b) defines "commerce" as trade or commerce among the several states or from any state to any place outside thereof.

Section 203 was amended effective January 26, 1950, changing "or in any process or occupation necessary to the production thereof" to "or in any closely related process or occupation directly essential to the production thereof." As to the radar parts made for Dalmo-Victor it is obvious that they were necessary to the production of the units shipped by Dalmo-Victor to Westinghouse. The process of working on them by plaintiff at defendant's plant was both closely related and directly essential to the production thereof, so it is immaterial whether the original section or the section as amended is applied.

### PRODUCTION OF GOODS FOR INTERSTATE COMMERCE

In *McComb* v. *Farmers Reservoir & Irr. Co.,* 167 F.2d 911, reservoir tenders, ditch riders, etc., of an irrigation company which sold and delivered water to farmers whose crops were processed and the finished products moved in interstate commerce were held to come under the act. ". . . their work is vital and essential to the integrated effort which brings about the movement of the finished products in commerce." (P. 914.) In *Waialua Agr. Co.* v. *Maneja,* 97 F.Supp. 198, employees who maintained sugar plantations housing in which the company's employees and their families lived were held to be engaged in production of goods for commerce. In *Harris* v. *Crossett Lbr. Co.,* 62 F.Supp. 856, the work of the employee was held to come under the act. He was a pumper and tender of water wells. The water produced by the wells was pumped into a reservoir, from which it was conveyed to his employer, a lumber company, and to other industries operated in conjunction with the lumber mills. Seventy to 90 per cent of the products of the employer's mills moved in interstate commerce. In *Sermond* v. *Lotz* (N.J.), 47 A.2d 432, the employee worked for an ice company. He pushed the ice down a chute and made it available for loading upon

---

*Unless otherwise noted, all italics added.

his employer's delivery trucks. The employer sold ice to a dealer who in turn sold it to a railroad company for use in cooling drinking water to be used by the railroad's employees who were engaged in interstate commerce. The ice was delivered to the railroad company by the plaintiff's employer for the dealer's account. The employer also sold ice directly to a dyestuff manufacturer to be used to lower the temperature of the chemicals used in compounding the dyestuffs. These were shipped in interstate commerce. It was held that the employee came within the act. In *Chapman* v. *Home Ice Co. of Memphis*, 136 F.2d 353, a part of the defendant's business was selling and delivering to interstate railroads ice to be placed in refrigerator cars for preserving shipments of perishable commodities to other states. Plaintiff employee was held to be engaged in interstate commerce. In *Warren-Bradshaw Drilling Co.* v. *Hall*, 317 U.S. 88 [63 S.Ct. 125, 87 L.Ed 83], it was held that an employee of an owner and operator of drilling equipment who contracted with owners and lessees of oil land to drill for oil, which oil when produced from wells so drilled was to be transported in interstate commerce, came within the act.

█ These are only a few of the many cases demonstrating how liberally the courts interpret "interstate commerce" as applied to the Fair Labor Standards Act. In our case the work done by plaintiff was more directly connected with the finished product than any of the work in the above mentioned cases. Without the parts worked on by plaintiff and sold by defendant to Dalmo-Victor there could have been no radar units to be shipped to Westinghouse; and without the dies which went to Marchant there could have been no covers for the calculating machines.

As to the Dalmo-Victor parts the finding that plaintiff's work on them did not affect or go into interstate commerce is erroneous.

### KNOWLEDGE OF EMPLOYER

█ In its memorandum opinion the court stated that the goods sold to Dalmo-Victor were sold by defendant in intrastate commerce—the later sale to Westinghouse in Maryland "being but an afterthought; not at all contemplated by the original sale." Just what the court meant by this statement it is difficult to determine. There was no evidence that the sale was an afterthought. The evidence shows that the material worked on went into interstate commerce but that defendant did not know until after delivery was made

to Dalmo-Victor, that the latter had a contract with Westinghouse.

The evidence in this case, then, is that the only products worked on by plaintiff shown to have affected interstate commerce were the Dalmo-Victor parts. Defendant is not shown to have known that they were to be so used until after they were produced. Does such knowledge have to be shown?

In *Cullum* v. *Stevens*, 46 F.Supp. 73, the judge stated (p. 73): "The question is here squarely raised, whether the Act applies where the employee was actually producing goods for commerce, as defined by the Act, while he and his employer were wholly unaware of that fact." In holding that the lack of such knowledge did not relieve defendant of civil liability, the judge pointed out that such apparently was the intent of Congress because of an "absence in the Act of any qualifying words such as knowingly, willfully, etc., in the civil liability provisions of the Act, and their presence, on the other hand, in all of its criminal liability provisions." (P. 74.) He then states (p. 74): ". . . the law was carefully so worded, whether an employer violated it and became liable to any employee for minimum wages or overtime, or both, does not depend upon, or require, proof that the violation was willfully or knowingly or intentionally done. It simply provides for liability, if it is done. Further, the burden of proof is on plaintiffs in these cases, and, as a practical matter, Congress could readily visualize that to require proof by the employee that his employer knew or believed that he was producing goods for interstate commerce would often be a burden impossible of discharge. This is so, because it would involve insurmountable difficulties in proving knowledge as a fact by affirmative proof, but also still greater difficulty in offering circumstantial proof, that would impute sufficient legal knowledge to the employer to enable him to determine for himself whether his production of goods was for commerce, as defined. . . . Again I say, the lack of knowledge of defendant that the devices he made were going into interstate commerce, and therefore, his honest belief that his business did not come under the Act can constitute no defense; that however unintentionally or unwittingly he may have violated the Act, if he nevertheless did violate it, cannot save him from the civil liability, which the law guarantees to the employee."

In the Cullum case the judge prefaced his ruling as follows: "My construction of the Act is, the lack of such knowl-

edge did not relieve defendant of civil liability where, as here, a substantial portion of the devices [on which the plaintiff worked] were being steadily and directly sold into other States by the local party for whom they were made." In view of that preface, it may be that the holding does not go to the extent of establishing liability under all circumstances where the product affects interstate commerce. If it does, it would appear to be the only opinion going that far. In *Bagby* v. *Cleveland Wrecking Co.*, 28 F.Supp. 271, the court said (p. 272): "The mere fact that goods which are manufactured or produced locally pass later into interstate commerce does not make the transaction one constituting interstate commerce." The rule has been further discussed in the following cases.

In *Warren-Bradshaw Drilling Co.* v. *Hall, supra*, 317 U.S. 88, the contention was made that the employer was an independent contractor not financially interested in the wells he drilled and having no intention, expectation or belief that any oil produced would be shipped in interstate commerce, and hence did not come under the act. The court did not pass upon the question as to the necessity for knowledge by the employer, saying (p. 92): "Assuming that such expectation, or a reasonable basis therefor, was necessary on petitioner's part before the application of the Act to petitioner, it is here present. The record contains ample indication that there were reasonable grounds for petitioner to anticipate, at the time of drilling, that oil produced by the wells drilled, would move into other states."

In *D. A. Schulte, Inc.* v. *Gangi*, 328 U.S. 108 [66 S.Ct. 925, 90 L.Ed. 1114, 167 A.L.R. 208], the court was considering the application of the act to building service and maintenance employees of petitioner who operated a 23-story loft building. There were 12 tenants engaged in producing garments for nontenant city business organizations which subsequently sold the articles in interstate commerce. It was claimed that there was no evidence that any of the tenants knew at the time of production and as to four of them that they did not even know later, that their products were to be shipped in interstate commerce. The Circuit Court of Appeals [*Gangi* v. *D. A. Schulte, Inc.*], 150 F.2d [694], 697, held: "And the testimony clearly shows that at the time of production these tenants had at the very least reasonable grounds to anticipate that their products would move in other states. This is all that had to be shown to constitute them

interstate producers." The Supreme Court held (p. 121 [328 U.S.]): "... we think the conclusion of the Circuit Court of Appeals that these tenants had reasonable grounds to anticipate that material quantities of their production would move interstate is well supported. It is not essential that individual products should be traced. It is sufficient that, from the circumstances of production, a trier of fact may reasonably infer that a producer has grounds to anticipate that his products will move interstate. . . . Producers may be held to know the usual routes for distribution of their products."

Another statement of the rule appears in *Tobin* v. *Celery City Printing Co.*, 197 F.2d 228, 229: "In determining the coverage of the Act, a manufacturer cannot assume an attitude of detached aloofness from his product, ignoring the ultimate purpose or use for which it is intended. If he knows, or reasonably should know, that in the normal and ordinary course of business his product will move in interstate commerce, or if he intends or expects that it will so move, either alone or in connection with some other product, he is a producer of goods for commerce within the meaning of the Act. Actual knowledge that his product will so move is not essential. Nor is it of any consequence that the manufacturer's activities in connection with the product terminate before it moves in interstate commerce."

In *Grippentrog* v. *Cheese Makers' Mfg. Co.*, 245 Wis. 1 [13 N.W.2d 391], the court said: "... in the absence of any proof to show that cheese boxes produced by defendant during the times in question moved in interstate commerce, *or that defendant intended, hoped or expected, or had reason to believe that they would so move,* there cannot be sustained any recovery on account of overtime in the production thereof." (P. 394 [13 N.W.2d].)

In spite of the broad language in the Cullum case, we believe that the true rule is that expressed in the other cases, *supra,* namely, that the employer is brought within the provisions of the act if he knows, intended, hoped, expected or had reason to believe that his product would move in, or affect, interstate commerce.

In our case, there was sufficient evidence from which the court might have inferred that the type of work being done for Dalmo-Victor by defendant, and defendant's general knowledge of the products of that company, were such that defendant knew, or should have known, that in the ordinary

course of business his product would move in interstate commerce. While the burden was on plaintiff, he made out a prima facie case when he showed that defendant's products did go into interstate commerce. It was not sufficient for defendant then to show only that he did not know of the Westinghouse contract. He was required, under the Tobin case, *supra*, 197 F.2d 228, and even under the Cullum case, *supra*, 46 F.Supp. 73, to show that he neither knew nor should have known that his product would move in interstate commerce, and the court should have made a finding on the subject. The absence of such a finding requires a reversal.

## MARCHANT

As to the dies delivered to Marchant, as pointed out before, there is no evidence that the calculators upon which they were used went into interstate commerce, nor that Marchant was engaged in interstate commerce. Plaintiff contends that a substantial portion of Marchant's products go into interstate commerce, and that the trial court and this court are required to take judicial notice of that fact.

The trial court made no express finding on the subject, nor can we find in the record any request in the trial court that it take judicial notice of the matter. (There may have been briefs on it, although the record fails to show that there were.) Inasmuch as the case has to be reversed, we do not deem it necessary to determine whether the tests as to judicial knowledge, well stated by Mr. Justice Olney in *Varcoe* v. *Lee*, 180 Cal. 338 [181 P. 223], have been met. As the case has to be retried, it appears to us that in the interests of justice evidence concerning the scope of Marchant's activities should be offered, and the matter further considered by the court.*

Defendant contends that plaintiff did not prove the overtime chargeable to the Dalmo-Victor and Marchant jobs. Plaintiff testified that he made out the time cards which his employer kept and that from these cards he had copied his time. This copy was admitted in evidence without objection. Then defendant introduced in evidence the time cards which

---

*It should be pointed out in this connection that "It is truly said that the power of judicial notice is as to matters claimed to be matters of general knowledge one to be used with caution. If there is any doubt whatever either as to the fact itself or as to its being a matter of common knowledge evidence should be required." (*Varcoe* v. *Lee, supra,* 180 Cal. at p. 345.)

showed the job numbers of the work plaintiff was engaged in during the period in question. Thus, the overtime chargeable to the particular job was before the court.

■ ". . . an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." (*Lewellen* v. *Hardy-Burlingham Min. Co.*, 73 F.Supp. 63, 66; *Anderson* v. *Mt. Clemens Pottery Co.*, 328 U.S. 680 [66 S.Ct. 1187, 90 L.Ed. 1515].)

At the end of the trial the court suggested that the parties agree on the number of overtime hours. Defendant had testified that he had paid plaintiff for a certain amount of overtime, not in cash but in hours. Plaintiff denied this. The parties then stipulated as to the total overtime, to be reduced, however, by a designated number of hours, if the court believed defendant's testimony. The court did not find on this question. Thus there was before the court sufficient evidence on the subject. Undoubtedly on the new trial this matter can be cleared up.

The judgment is reversed.

Peters, P. J., and Wood (Fred B.), J., concurred.